

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

)
RBM Technologies, Inc.,                    )
                                           )
           Plaintiff,                      )
v.                                         )
                                           )
Albert L. Lash, IV,                        )
                                           )
           Defendant.                      )

DISTRICT COURT DEPT.
CIVIL ACTION NO.

04-0047

FILED
U.S. DISTRICT COURT
DISTRICT OF MASS.

**VERIFIED COMPLAINT**

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR ... ESEX

JAN 06 2004

01/07/04 ... 0000 2117 CLERK A
                    TRO           90.00
                    SURTTL        90.00
                    TOTAL         90.00
                    CHECK         90.00

## I. PARTIES

1. The plaintiff, RBM Technologies, Inc. (the "Company"), is a Delaware corporation with a principal place of business at 25 Mount Auburn Street, Cambridge, Massachusetts, Middlesex County, Massachusetts.

2. The defendant, Albert L. Lash, IV ("Lash"), is an individual residing at 32 Bishop Road, Apartment 4, Quincy, Norfolk County, Massachusetts.

## II. JURISDICTION AND VENUE

3. Pursuant to G.L. c. 223A §2, this Court has direct and personal jurisdiction over Lash, because Lash is domiciled in the Commonwealth of Massachusetts.

4. Pursuant to G.L. c. 223 §1, this Court is a proper venue for this action because the plaintiff has a principal place of business in Middlesex County, Massachusetts.

## III. FACTUAL BACKGROUND

5. On or about January 12, 2000, Arthur R. Greene, Jr. ("Greene") incorporated the Company, and Greene owns approximately 93% of the Company and is its majority shareholder, President and Treasurer.

01/06/04 15:56H0000 2095 CLERK E
                    CIVIL         240.00
                    SURCHARGE      15.00
                    SECC           20.00
                    040047 #
                    SUBTTL        275.00
                    TOTAL         275.00
                    CHECK         275.00

6. For over 20 years prior to incorporating the Company, Greene had a successful career developing merchandising presentations for various services and products offered by retail banks.

7. Over his 20-year career, Greene and his company, RBM Systems, Inc. ("RBM Systems"), of which Greene owns 100%, provided the above services to thousands of bank locations nationwide.

8. As a result of his business experience, Greene perceived a need in the market for an internet-based system that would enable banks and other retail businesses to send clear visual directives to their retail locations regarding how to display product and service information, and the Company was incorporated to pursue this business.

9. In the winter and spring of 2001, without any involvement by or input from Lash, the Company developed a working prototype software named Merchandising Manager, which enabled bank and other retail executives to manage presentations regarding products and services at retail locations via the internet.

10. Since approximately May 2001, the Company has been marketing the prototype software to customers nationwide.

11. On or about August 1, 2001, the Company entered into a written employment contract (the "Contract"), a copy of which is attached hereto and incorporated herein by reference as Exhibit A, with Lash, pursuant to which he served as the Company's Vice President and Managing Director of Technology.

12. As the Company's Vice President and Managing Director of Technology, pursuant to the Contract, Lash was "responsible for the development, coding and implementation of software for use by and licensing by the Company to its customers, and . . . [was required

to] discharge such duties and responsibilities as are customary for the chief technology

officer of a software technology company . . .".

13. Lash's primary responsibility was to refine the Merchandising Manager software.

14. Pursuant to the "Term of Employment" section of the Contract, Lash was required to give

not less than thirty (30) days' notice before terminating the Contract.

15. In the "Prohibited Competition" section of the Contract, Lash:

> "agree(d) that during the course of (his) employment with the Company, the
> Company will furnish, disclose or make available to (him), or (he) will have
> access to, confidential and proprietary information related to the Company's
> business. (He) also acknowledge(d) that such confidential information has been
> developed and will be developed by the Company through the expenditure by the
> Company of substantial time, effort and money and that all such confidential
> information could be used by (him) to compete with the Company."

16. In the "Prohibited Competition" section of the Contract, Lash agreed that:

> "in consideration of the Company's agreement to employ (him) and in view of the
> confidential position to be held by (him) and the confidential nature and
> proprietary value of the information which the Company may share with (him) . .
> . that during the entire period which (he) performed services for the Company and
> for a period of two (2) years following the termination of (his) employment,
> whether such termination is voluntary or involuntary, that (he) shall not, without
> the prior written consent of the Company: (a) . . . engage in or have a financial
> interest in a business which is directly or indirectly competitive with the business
> of the Company within the United States of America; or (b) . . . solicit, divert or
> appropriate or attempt to solicit, divert or appropriate . . . any customers, clients
> or patrons of the Company, or any prospective customers, clients or patrons with
> respect to which the Company has developed or made a sales presentation (or
> similar offering of services). . .".

17. In the "Prohibited Employment" section of the Contract, Lash also agreed that:

> "(i) the types of employment which are prohibited by this agreement are narrow
> and reasonable in relation to the skills which represent (his) principal salable asset
> both to the Company and to other prospective employers, and (ii) the
> geographical scope of the provisions of this Section is reasonable, legitimate and
> fair to (him) in light of the Company's need to market the services and sell its
> products in that specific geographic area in order to have a sufficient customer
> base to make the Company's business profitable in light of the limited restrictions

and the type of employment prohibited herein compared to the types of employment for which (he is) qualified to earn (his) livelihood."

18. In the "Confidential Information" section of the Contract, Lash agreed that:

"[he was and would] be in possession of confidential and proprietary information concerning the administrative, management, financial, technical and marketing activities of the Company, including, but not limited to, software, technical data, algorithms, formulae, specialized programs and code, customer lists, procedures, processes, plans, strategies, costs and financial data and other trade secrets of a proprietary nature, including research, development and knowledge regarding the Company's services and products (collectively the 'Confidential Information'). It is recognized that the Confidential Information . . . is a valuable, special, proprietary and unique asset of the Company's business."

19. In the "Confidential Information" section of the Contract, Lash agreed not to disclose:

"both during and after the term of (his) employment with the Company, any Confidential Information . . . for any reason or purpose whatsoever . . . except for use in connection with the performance of (his) duties and responsibilities hereunder or except as the Company may otherwise permit in writing."

20. In the "Ownership of Ideas, Copyrights and Patents" section of the Contract, Lash

agreed:

"that all ideas, discoveries, creations, manuscripts and properties, innovations, improvements, know-how, inventions, designs, developments, apparatus, techniques, methods and formulae (all of the foregoing being hereinafter referred to as "proprietary information") which may be used in the business of the Company, whether patentable, copyrightable or not, which (he) may conceive or develop during the term of employment with the Company or in the performance of any services for the Company, alone or in conjunction with others, whether during or out of regular business hours, and whether at the request or upon the suggestion of the Company, or otherwise, **shall be the sole and exclusive property of the Company**, and that (he) will not publish or divulge any of the proprietary information without the prior written consent of the Company." (emphasis added).

21. In the "Injunctive Relief" section of the Contract, Lash expressly agreed:

"that any breach **or threatened** breach of any of the terms and/or conditions set forth in the sections . . . entitled "Prohibited Competition", "Confidential Information" or "Ownership of Ideas, Copyrights and Patents" will result in substantial, continuing and irreparable injury to the Company. Accordingly, he . . . (agreed) that, in addition to any other remedy that may be available to the

Company, the Company shall be entitled to injunctive or other equitable relief by a court of appropriate jurisdiction in the event of any breach (or) **threatened breach** of the terms of those sections." (emphasis added).

22. In the "Company Property" section of the Contract, Lash agreed that "(u)pon termination of (his) employment with the Company for any reason, (he) agreed(d) to deliver to the Company any property of the Company which may be in (his) possession . . .".

23. At present, the Company has contracted with Rockland Trust Company, Provident Bank, Harris Bank, BMO Financial and AT&T Wireless to provide the Merchandising Manager software as well as other services.

24. On or about December 8, 2003, Lash terminated his employment with the Company, effective immediately, without providing the thirty (30) day notice required by the Contract.

25. Since December 8, 2003, Lash has threatened to compete with the Company's business, solicit the Company's customers and prospective customers and sell the Company's software and related services for his own financial gain.

26. On February 16, 2000, the Company contracted with a domain name registration service named Dotster, Inc. of 11807 Northeast 99th Street, Suite 1100, Vancouver, WA for the internet domain name "rbmtechnologies.com," and RBM Systems has paid all expenses in connection with the same on behalf of the Company.

27. Dotster, Inc. is accredited with the Internet Corporation for Assigned Names and Numbers as a registrar for internet domain names

28. Pursuant to a printout of information from Dotster Inc.'s website, a copy of which is attached hereto and incorporated herein by reference as Exhibit B, the Company is the registrant and owner of the domain name "rbmtechnologies.com" (the "Domain Name").

29. From February 16, 2000 until December 23, 2003, the Domain Name has been registered at dotster.com and pointing to the internet address of an internet computer system located at the Company's offices at 25 Mount Auburn Street, Cambridge, Massachusetts while e-mail addresses containing the suffix "@rbmtechnologies.com" have been directed to an internet mail service called "Interland," which services the Company's e-mail accounts.

30. On December 23, 2003, approximately two (2) weeks after Lash terminated his employment with the Company, Lash contacted Dotster, Inc. and fraudulently represented himself as still being employed by the Company and still being the "Administrative, Technical Contact" from the Company and redirected both the Domain Name and e-mail addresses for "rbmtechnologies.com" to an unknown site.

31. On December 23, 2003, before Lash redirected the Domain Name and e-mail addresses, when you accessed the Company website by typing "rbmtechnologies.com", you saw the screen attached hereto and incorporated herein by reference as Exhibit C.

32. After Lash redirected the Domain Name and e-mail addresses on December 23, 2003, when you attempt to access the Company website by typing "rbmtechnologies.com", you see the screen attached hereto and incorporated herein by reference as Exhibit D.

33. Since Lash's conversion of the Company's Domain Name and e-mail addresses on December 23, 2003, the Company's customers have been unable to visit the Company's website; the Company's employees have been unable to send or receive e-mails and customers' e-mails to the Company are being wrongfully intercepted by, and perhaps replied to, by Lash.

34. General counsel for Dotster, Inc. has informed Greene that it will not return control of the Domain Name, e-mail addresses and website to the Company without an order from this Court.

35. On December 23, 2003, at approximately the same time Lash commandeered the Domain Name and e-mail addresses for the Company, an as of yet unidentified person misrepresented himself as an RBM Systems' contractor and attempted to switch the RBM Systems' domain name, rbmsystems.com, and e-mail addresses to himself.

36. Upon information and belief, Lash was the person who attempted to redirect RBM Systems' domain name, rbmsystems.com, and e-mail addresses himself.

37. Lash's conduct, as described above and below, is causing the plaintiff immediate and irreparable harm by, for example, depriving its customers and employees access to its Domain Name, e-mail and website, resulting in damage to its goodwill, reputation and image as a cutting edge internet company.

## COUNT I -BREACH OF CONTRACT

38. The plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 37 above as if each were fully set forth herein.

39. The Contract is a binding contract between the Company and Lash.

40. The Company has lived up to all of its obligations under the Contract, including but not limited to paying Lash and conveying shares of stock to him pursuant to the Contract.

41. Lash has breached the Contract by failing to give the required thirty (30) day notice before terminating the Contract.

42. Lash has breached the Contract by his conversion of the Company's Domain Name and e-mail addresses.

43. Lash has breached the Contract by claiming ownership of the unique Merchandising Manager software.

44. Lash has breached the Contract by refusing to provide the Company with critical information including, but not limited to, user names and passwords, regarding the Merchandising Manager software and related software and operating systems without being paid for the same.

45. Lash has breached the Contract by taking unique demonstration software.

46. Since December 8, 2003, Lash has breached the "Injunctive Relief" section of the Contract by threatening to compete with the Company's business to solicit the Company's customers and prospective customers and to sell the Company's software and related services for his own financial gain in breach of the "Prohibited Competition" section of the Contract.

47. As a result of Lash's breach of the Contract, the Company has suffered and continues to suffer damages.

48. This is a cause of action by the Company against Lash for breach of contract.

## COUNT II - CONVERSION

49. The plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 48 above as if each were fully set forth herein.

50. The Company has a right to possession of the Domain Name, e-mail addresses containing the suffix "@rbmtechnologies.com", usernames and passwords associated with the Merchandising Manager software and related software and operating systems and unique demonstration software.

51. By taking control of the Domain Name, e-mail addresses containing the suffix

"@rbmtechnologies.com", user names and passwords associated with the Merchandising

Manager software and related software and operating systems and unique demonstration

software, Lash has converted the Domain Name, e-mail addresses containing the suffix

"@rbmtechnologies .com", user names and passwords associated with the Merchandising

Manager software and related software and operating systems and unique demonstration

software to his own use by exercising dominion and control over them inconsistent with

the Company's ownership rights.

52. As a result of Lash's conversion, the Company has suffered and continues to suffer

damages.

53. This is a cause of action by the Company against Lash for conversion.

## COUNT III - MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION

54. The plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1

through 53 above as if each were fully set forth herein.

55. Through his former employment with the Company, Lash possesses trade secrets

belonging to the Company, including software developed by the Company, client

information kept by the Company, access codes and passwords and unique usernames.

56. The Company has taken reasonable steps to preserve the secrecy of the above

information.

57. Lash has a duty at common law not to disclose this information or use it for his own

benefit.

58. Lash has breached the duty by using this information to take control of the Domain Name

and by threatening to use his knowledge of the Company to compete with the Company

and solicit its customers.

59. Lash has unlawfully taken trade secrets with intent to convert them to his own use.

60. Lash's conversion of the Company's trade secrets is in violation of the terms of the Contract, which is a written employment agreement between the Company and Lash.

61. As a result of Lash's breach, the Company has suffered and continues to suffer damages.

62. This is a cause of action for the taking of trade secrets at common law and under G.L. c. 93 § 42 and for injunctive relief under G.L. c. 93 § 42A.

## COUNT IV - DECLARATORY JUDGMENT

63. The plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 62 above as if each were fully set forth herein.

64. Lash disputes that he is bound by the Contract and consequently required to, among other things, honor the "Prohibited Competition", "Confidential Information," "Ownership of Ideas, Copyrights and Patents" and "Company Property" provisions.

65. The Company takes the position that Lash is bound by all provisions of the Contract.

66. Pursuant to G.L. c. 231A and Mass. R. Civ. P. Rule 57, the plaintiff alleges this cause of action for declaratory relief seeking to have this Court declare that the Contract is in full force and effect and that the defendant is bound by the Contract.

67. An actual controversy has arisen between the plaintiff and the defendant within the meaning of G.L. c. 231A, §1 regarding whether the Contract is in full force and effect and binding on the defendant.

68. The controversies between the parties are justiciable in character.

## COUNT V - VIOLATION OF G.L. C. 272 § 99 (Q)

69. The plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1

through 68 above as if each were fully set forth herein.

70. Lash has intercepted e-mail communications intended for use by the Company.

71. The e-mail communications constituted "wire communications" as defined in G.L. c. 277 § 99 (B) (1).

72. Lash's interception of Company e-mail was not authorized.

73. Lash's interception violated the Company's property or privacy interests in the contents of the e-mails.

74. This is a cause of action for violation of G.L. c. 272 § 99 (Q).

WHEREFORE, the plaintiff, RBM Technologies, Inc., requests that this Court:

A.    Enter judgment in the plaintiff's favor against the defendant;

B.    Issue a temporary restraining order and preliminary injunction against the defendant as requested by the plaintiff;

C.    Make a declaration that the defendant is bound by the Contract;

D.    Grant the plaintiff its costs and reasonable attorney's fees; and

E.    Grant such other relief as justice and equity may require.

THE PLAINTIFF HEREBY CLAIMS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,
RBM Technologies, Inc.,
By its attorneys,
THE McLAUGHLIN BROTHERS, P.C.

By:  _____
George A. McLaughlin, III
BBO No. 544822
28 State Street, 31st Floor
Boston, MA  02109
(617) 523-7165

Dated: January 6, 2004

## VERIFICATION

I, Arthur R. Greene, Jr., the president of the plaintiff in the within action have read the foregoing Verified Complaint and hereby certify that the facts stated therein are true, and, as to those matters alleged on information and belief, I hereby verify that they are true to the best of my knowledge and belief.

Signed under the pains and penalties of perjury this ⁶ᵗʰ day of January, 2004.

RBM Technologies, Inc.

By: _____

Its President,
Arthur R. Greene, Jr.

# *RBM* Technologies

**RBM Technologies, Inc.**
25 Mount Auburn Street
Cambridge, Massachusetts 02138
617 576-1234

August 1, 2001

Mr. Albert L. Lash IV
21 Rockwood Road
Hingham, MA 02043

     Re: <u>Engagement Letter</u>

Dear Albert:

     This letter will confirm the terms of your employment by RBM Technologies, Inc. (the "Company").

     You will continue to be engaged as a consultant to the Company in your current capacity and under the current compensation arrangements until the commencement of your full-time employment, as described below.

     At a mutually agreeable date during September 2001, you will commence full-time employment with the Company as its Vice President and Managing Director, Technology. In such capacity, you will be responsible for the development, coding and implementation of software for use by and licensing by the Company to its customers, and shall discharge such duties and responsibilities as are customary for the chief technology officer of a software technology company, together with such additional duties as the Board of Directors of the Company (the "Board") may assign, consistent with such office. You shall report to the President of the Company, and shall devote your full business time and best efforts in the faithful performance of your duties and to the promotion of the business objectives of the Company.

<u>Term of Employment</u>.

     Your employment will continue until the first to occur of the following:

(a)     your death or physical or mental incapacity;

(b)     Immediate termination by the Company upon written notice for "Cause", which shall include (i) illegal, dishonest or negligent conduct which constitutes a breach of your covenants and obligations under this letter agreement or under any applicable legal principle, or which involves funds or other assets of the Company, (ii) any conduct which is likely to have a material adverse effect upon the goodwill or business position of the Company, or (iii) your failure to carry out your duties to the Company hereunder.

(c)     Termination by either party, for any reason, upon not less than thirty (30) days' notice to the other.

<u>Compensation</u>

Prior to commencement of your full-time employment as Vice President and Managing Director, Technology, you will be compensated under the current hourly arrangement. Commencing with your full-time employment, the Company will pay you an annual salary in an amount to be mutually determined, payable in 26 equal bi-weekly installments, less any amounts required to be withheld under applicable law.   The Company may from time to time, but shall not be obligated to, grant you performance or other bonuses as additional compensation.

<u>Reimbursement of Expenses and Benefits</u>

In addition to salary, you will be entitled to reimbursement for all ordinary and reasonable out-of-pocket business expenses which are reasonably incurred by you in furtherance of the Company's business in accordance with reasonable policies from time to time adopted by the Company or as shall be approved in advance by the Company.

You will be entitled to ten (10) days of vacation leave for in each year at a time or times (either consecutively or not consecutively) mutually agreeable to the Company and you. If you do not use your vacation leave in any year, you will not be entitled to carry the unused days over from year to year. The Company will not pay you any additional compensation for any vacation time which is not used.

2

You will also be entitled to participate in any executive benefit plans which the Company provides or may establish for the benefit of its executives generally, but only if and to the extent provided in such executive benefit plans. Nothing contained herein shall obligate the Company to provide or maintain any such executive benefit plans.

## Stock Award; Repurchase Option

In addition to compensation as provided above, at the time of the commencement of your employment hereunder during September 2001, you will be granted one hundred twenty (120) shares (the "Shares") of the Common Stock, $.01 par value, of the Company. The Shares will represent ten percent (10%) of the issued and outstanding shares of Common Stock of the Company as of that date. The Shares shall vest on the following schedule:

| Vesting Date | Total Vested Shares | Total Unvested Shares |
|---|---|---|
| Dec. 15, 2001 | 10 | 110 |
| Mar. 15, 2002 | 20 | 100 |
| June 15, 2002 | 30 | 90 |
| Sept.15, 2002 | 40 | 80 |
| Dec. 15, 2002 | 50 | 70 |
| Mar. 15, 2003 | 60 | 60 |
| June 15, 2003 | 70 | 50 |
| Sept.15, 2003 | 80 | 40 |
| Dec. 15, 2003 | 90 | 30 |
| Mar. 15, 2004 | 100 | 20 |
| June 15, 2004 | 110 | 10 |
| Sept.15, 2004 | 120 | 0 |

The Company will issue the Shares, in your name, in twelve (12) certificates, each in the amount of ten (10) shares. The Company will hold certificates for all unvested Shares, and release to you one such certificate in the amount of ten (10) shares on each Vesting Date as set forth above.

Repurchase Option

In the event that your employment with the Company shall terminate for any reason whatsoever prior to September 15, 2004, the Company shall have the option, exercisable by written notice to you within thirty (30) days of the date of such termination of employment, to repurchase all or any portion of the Shares as of the effective date of such termination of employment, at a purchase price equal to (i) $.01 per share for each unvested Share so repurchased; and (ii) the fair market value for each vested Share so repurchased. The "fair market value" of the Shares as of the date of such termination of employment shall be conclusively determined by the Board, acting in good faith and taking into account such factors as shall be relevant and reasonable, including, but not limited to, the annual revenue, annual operating income and operating cash flow of the Company. In making such determination, the Board may, but shall not be obligated to, consult with independent professional evaluators.

If the Company elects to repurchase any or all of the Shares pursuant to the foregoing provisions, the Company shall furnish you with written notice thereof within thirty (30) days of the termination of your employment, which notice will specify the Shares that the Company is electing to purchase, the fair market value of any vested Shares that the Company is electing to repurchase, and the date on which the Company and you will effect such repurchase (the "Closing"), which date shall not be more than ninety (90) days after the date of termination of your employment. At the Closing, you agree to deliver any certificates for the Shares which the Company has elected to repurchase, duly endorsed to the Company, and to execute and deliver stock powers or other appropriate instruments of transfer with respect to such Shares, and the Company agrees contemporaneously to deliver you a check in the amount of the purchase price for such Shares and to deliver to you certificates for any Shares as to which the Company has not duly exercised its repurchase option hereunder. The Closing shall take place at the Company's offices, or at such other place as shall be mutually agreed between you and the Company. By your acceptance hereof, you agree and hereby appoint the Company and its Secretary or Assistant Secretary as your true and lawful attorney-in-fact, with full power to endorse any stock powers or stock certificates in your name for the purposes hereof, and to transfer any and all certificates, for and in your name, on the books of the Company and in the Company's stock ledger, with respect to any Shares as to which the Company has duly and properly exercised its option to repurchase as set forth above.

If the Company does not elect to repurchase all of the Shares in accordance with the preceding paragraph, you shall, after the thirty (30) day notice period commencing with the date of termination of your employment, hold any and all Shares which the Company has not elected to repurchase free and clear of the repurchase option set forth in this Section, but subject nevertheless to the restrictions on transfer and right of first refusal set forth in the following Section.

### Restrictions on Transfer; Right of First Refusal

You understand and agree that you shall have no right to sell, transfer, assign or pledge any of the unvested Shares without the prior written consent of the Company, which the Company may grant or withhold in its sole discretion. You further understand and agree that you shall have no right to sell, transfer, assign or pledge any of the vested Shares, except in accordance with this Section. If at any time while you own any vested Shares you receive from any other person a bona fide written offer to purchase any of the vested Shares, which offer you desire to accept, you shall first notify the Company in writing of your desire to accept such offer and you shall furnish to the Company a copy of such written offer. The Company shall have thirty (30) days from the date of receipt by the Company of such written notice (the "Option Period") within which to notify you in writing you of its election as to whether the Company desires to purchase all, but not less than all, of the Shares subject to the written offer, at the price set forth in the third party offer, which notice shall specify a date for the closing of the transaction, which date shall not be more than ninety (90) days after receipt by the Company of your notice of desire to sell some or all of your vested Shares (the "RFR Closing"). Failure by the Company to make such election to purchase the Shares subject to the written offer within such thirty (30) day period shall be deemed to be an election by the Company not to so purchase said Shares.

If the Company elects to purchase all of the Shares subject to such third party written offer at the price set forth therein, at the RFR Closing you agree to deliver any certificates for the subject Shares, duly endorsed to the Company, and to execute and deliver stock powers or other appropriate instruments of transfer with respect to such Shares, and the Company agrees contemporaneously to deliver you a check in the amount of the purchase price for such Shares. If the Company does not elect to purchase all of the Shares subject to such third party written offer, you may sell the subject Shares, provided that the (i) the sale is made only to the offeror identified in your notice, (ii) the sale shall be for a price not less than the noticed offering price, and (iii) the sale shall be consummated within sixty (60) days after the expiration of the Option Period.

<u>Stock Certificates; Legends</u>

You understand and acknowledge that the Shares have not been registered under the Securities Act of 1933 (the "Act") and you hereby warrant to the Company that you are acquiring the Shares for investment and not with a view to the sale or resale of the Shares in connection with any purchase or acquisition of the Shares by you. In connection therewith, you agree to be bound by the provisions of the legends in substantially the following form which shall be endorsed upon the certificate(s) evidencing the Shares:

> "The shares represented by this certificate have been taken for investment and they may not be sold, pledged or otherwise transferred by any person in the absence of an effective registration statement for the shares under the Securities Act of 1933 or an opinion of counsel satisfactory to the Company that an exemption from registration is then available.

> "The shares represented by this certificate are subject to restrictions on transfer, rights in favor of the Company and other terms and conditions set forth in a certain letter agreement dated August 1, 2001 by and between Albert L. Lash IV and the Company. The Company will furnish copies of said letter agreement without charge to the holder of this certificate upon written request for the same.

<u>Section 83(b) Election</u>

The Company and you agree that within thirty (30) days of your acquisition of the Shares, you will file with the appropriate office of the Internal Revenue Service a written election with respect thereto pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended. In said election you agree to report your acquisition of the Shares as being subject to (i) restrictions which, by their terms, may or will never lapse (the Repurchase Option in the event of the termination of your employment, the Restrictions on Transfer and the Right of First Refusal set forth above) and (ii) restrictions which will lapse (the vesting of Shares as set forth above). Neither party will take any voluntary action with respect to the tax reporting of the transfer of the Shares to you hereunder which is inconsistent with any of the foregoing.

### Prohibited Competition

You recognize and acknowledge the competitive and proprietary nature and aspects of the business of the Company. You further acknowledge and agree that a business will be deemed competitive with the Company if it performs services in the nature of programming, designing, configuring or implementing software with substantially the same functionality as the software used or sold by the Company, or if it programs, manufactures or sells any of the specific products provided or offered by the Company or if it performs any other services and/or engages in the production, manufacture, distribution or sale of any product similar to services performed or products produced, manufactured, distributed or sold by the Company during the term of your relationship with the Company (such business to be referred to as a "competitive business").

You further acknowledge and agree that during the course of your employment with the Company, the Company will furnish, disclose or make available to you, or you will have access to, confidential and proprietary information related to the Company's business. You also acknowledge that such confidential information has been developed and will be developed by the Company through the expenditure by the Company of substantial time, effort and money and that all such confidential information could be used by you to compete with the Company.

Accordingly, you hereby covenant and agree, in consideration of the Company's agreement to employ you and in view of the confidential position to be held by you and the confidential nature and proprietary value of the information which the Company may share with you, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, that during the entire period during which you perform services for the Company and for a period of two (2) years following the termination of your employment, whether such termination is voluntary or involuntary, the you shall not, without the prior written consent of the Company:

(a)     For yourself or on behalf of any other, directly or indirectly, either as principal, agent, stockholder, employee, consultant, representative or in any other capacity, own, manage, operate or control, be concerned, connected or employed by, or otherwise associate in any manner with, engage in or have a financial interest in any business which is directly or indirectly competitive with the business of the Company within the United States of America; or

 dotster

my account | whois search | support

WWW. [                    ]

Domains  Hosting  Email  Renewals  Transfers  Design  Promotion  About Us  Pricing  Resellers  Affil

## Whois

WhoIs Information For: rbmtechnologies.com

BEGIN WHOIS RECORD --------

The data contained in the WHOIS database, while
believed by the company to be reliable, is provided "as is",
with no guarantee or warranties regarding its accuracy. This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose, including, but not
limited to, allowing or making possible dissemination or
collection of this data in part or in its entirety for any
purpose, such as the transmission of unsolicited advertising and
solicitations, is expressly forbidden. By submitting an inquiry, you agree
to these terms of usage and limitations of warranty.
Please limit your queries to 10 per minute and one connection.
 If you have a legitimate purpose for whois information please contact our customer service department.

Registrant:
   RBM Technologies
   25 Mount Auburn Street
   Cambridge, MA 02170
   US

   Registrar: DOTSTER
   Domain Name: RBMTECHNOLOGIES.COM
      Created on: 16-FEB-00
      Expires on: 16-FEB-04
      Last Updated on: 23-DEC-03

   Administrative, Technical Contact:
      Lash, Albert  albertlash@mac.com
      RBM Technologies
      25 Mount Auburn Street
      Cambridge, MA  02170
      US
      617-576-1234
      617-576-1325


   Domain servers in listed order:
      NS1.PHPWEBHOSTING.COM
      NS2.PHPWEBHOSTING.COM

End of Whois Information

END WHOIS RECORD --------

EXHIBIT C

RBM Technologies, Inc.



# RBM Technologies

**Welcome** Solutions  Support  Log In

## Welcome

RBM Technologies, Inc. develops marketing and sales management solutions for retail banks and financial institutions. The Merchandising Manager ℠ delivers product information and promotional messages from your business line managers and marketing groups to the right customers faster and more accurately than ever before possible. Our objective is to improve the results of your relationship sales efforts by simplifying the complexity of marketing as increasing array of products and services to geographically disperse communities of customers.

For additional information about RBM Technologies, Inc. or our flagship solution The Merchandising Manager ℠, please call or email us with any of your questions, comments, or suggestions.

RBM Technologies, Inc.
29 Mount Auburn Street
Cambridge, MA 02138
617.576.1234
info@rbmtechnologies.com

Copyright 2000-2002, RBM Technologies, Inc.
617 576 1234 info@rbmtechnologies.com

http://www.rbmtechnologies.com/

Cannot find server

EXHIBIT D

 The page cannot be displayed

The page you are looking for is currently unavailable. The Web site might be experiencing technical difficulties, or you may need to adjust your browser settings.

Please try the following:

- Click the Refresh button, or try again later.
- If you typed the page address in the Address bar, make sure that it is spelled correctly.
- To check your connection settings, click the **Tools** menu, and then click **Internet Options**. On the **Connections** tab, click **Settings**. The settings should match those provided by your local area network (LAN) administrator or Internet service provider (ISP).
- If your Network Administrator has enabled it, Microsoft Windows can examine your network and automatically discover network connection settings.
  If you would like Windows to try and discover them, click Detect Network Settings
- Some sites require 128-bit connection security. Click the **Help** menu and then click **About Internet Explorer** to determine what strength security you have installed.
- If you are trying to reach a secure site, make sure your Security settings can support it. Click the **Tools** menu, and then click **Internet Options**. On the Advanced tab, scroll to the Security section and check settings for SSL 2.0, SSL 3.0, TLS 1.0, PCT 1.0.
- Click the Back button to try another link.

Cannot find server or DNS Error
Internet Explorer

res://C:\WINNT\system32\shdoclc.dll/dnserror.htm

1/5/2004